# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

* * *

United States of America,

               Plaintiff,

    v.

Ray Anderson,

               Defendant.

Case No. 2:20-cr-00152-GMN-BNW

**REPORT AND RECOMMENDATION**

## I.    Introduction

      Before the Court is Defendant's motion to suppress. ECF No. 32. The government opposed the motion (ECF No. 40), and Defendant replied (ECF No. 43). The Court held an evidentiary hearing on August 25, 2021. ECF No. 47. The parties presented closing arguments on August 31, 2021. ECF No. 49.

      The basic facts of the case are as follows: On May 16, 2020, undercover detectives were in position at an apartment complex to serve a search warrant. Defendant Anderson allegedly backed into one of the detectives' unmarked vehicles (at stop 1) and then left the scene of the accident without complying with Nevada law. Anderson then allegedly drove to a different place in the same apartment complex (stop 2) where another undercover detective saw him retrieve a firearm, which was concealed in his waistband. Then, a third detective allegedly witnessed Anderson drive to a third parking spot (stop 3), get out his car, and look around nervously.[1] Anderson then left the apartment complex and drove to a second apartment complex, where he was stopped by police. Police detained Anderson and discovered he had prior felony convictions. After some time, two of the undercover detectives returned and searched Anderson's vehicle for the gun. A firearm was allegedly located in the hood of his car. As a result, he was indicted on

---

[1] For ease of reference, the last page of this report and recommendation is a copy of Defense Ex. QQ, on which the Court labeled where the three stops allegedly took place.

one count of being a felon in possession of a firearm under 18 U.S.C. §§ 922(g)(1) and 924(a)(2). *See* ECF No. 1.

Defendant moves to suppress the firearm, arguing that the search of his car resulted from an unlawful seizure. The government opposes the motion, arguing that police had probable cause to arrest Anderson for the accident and reasonable suspicion to stop him for carrying a concealed weapon. The government also argues that once police determined that Anderson had prior felony convictions, police had probable cause to search the car. As a result, the government argues that the vehicle search was a lawful search under the automobile exception and incident to arrest.

Ultimately, there were several inconsistencies in the evidence regarding what happened the day Anderson was arrested. As such, witness credibility was central to the Court's decision. As explained in more detail below, the Court finds that the government has not carried its burden to show by a preponderance of the evidence that police had probable cause to arrest Anderson for violating NRS 484E.020 (leaving the scene of an accident involving property damage). Likewise, the government did not carry its burden to show by a preponderance of the evidence that police had reasonable suspicion to stop Anderson for illegally carrying a concealed weapon. Accordingly, the Court recommends that Defendant's motion to suppress be granted.

In support of this recommendation, the Court summarizes the witnesses' testimony, provides its findings of facts and the parties' arguments, and analyzes the facts under the applicable law.

## II.   Background

### A.   Witness Testimony and Other Evidence

#### i.   Detective Mermini

Detective Mermini testified first. He testified as follows.

Detective Mermini has been employed by the Las Vegas Metropolitan Police Department (LVMPD) for approximately six years. Currently, he is a narcotics detective. He works in a covert capacity.

On the day in question, May 16, 2020, he was assigned to be the "eye" for a search warrant that was going to be executed on an apartment at 4055 University Center in Las Vegas,

Nevada. His job was strictly surveillance, specifically to watch the door of the apartment and direct other officers to take anyone who left the apartment into custody. He believes he started his surveillance that day between 3:30 p.m. and 3:45 p.m.

While surveilling, he was sitting in his undercover car (a white Nissan Altima) with the engine running.[2] He had a sunscreen on his windshield to keep a low-profile while conducting surveillance. His car had "very, very tinted" windows. Standing outside the vehicle, it was difficult to tell if anyone was in the vehicle. This was intentional because he was conducting surveillance; he did not want anyone to know he was in the car.

While in his car, he was watching the door and his surroundings. At some point, he saw a man walk through the parking lot, which he later identified in court as the Defendant, Anderson. He saw Anderson walk to the front driver's side door of Anderson's car. Anderson's car was parked directly in front of his car, "just a couple of feet" away. Both cars were parked parallel against a brick wall in the parking lot.[3] He heard Anderson get in the car but did not see it because of the sunscreen on his windshield. He also heard Anderson start his car. He heard the engine "rev" loudly and the tires "screech" or "squeal." This caught his attention, so he tried to peek through the gap at the bottom of his sunscreen. As he tried to peek, Anderson backed into his car.[4] He testified that the impact "slammed" him back into his seat, and he felt immediate lower-back pain. He also said Anderson hit him hard enough to "throw [him] back in [his] chair, causing pain." Detective Mermini testified that no one else saw the accident between Anderson and him. He knew this because he was the only one in that area. Everyone else was set up in different areas of the apartment complex.

Detective Mermini then "immediately" got on the covert radio (that his team was using) to advise his boss, Sergeant Adam Seely, that his vehicle had just been struck by another vehicle.[5] He also advised he would maintain his position of surveillance (because the SWAT team was

---

[2] Detective Mermini testified that he felt comfortable enough that having his engine running would not compromise his covert status as it pertained to the execution of the search warrant.

[3] There was also a car parked behind Detective Mermini's car.

[4] For ease of reference, the Court will refer to the place where Detective Mermini describes the accident taking place as stop one.

[5] This covert channel is not recorded for security purposes.

about to execute the search warrant in five to ten minutes). He believes he told Sergeant Seely about his back pain, because he was "hurting pretty good; I made sure to tell him."

Anderson then pulled his car out a bit and parked. Detective Mermini could observe Anderson and his vehicle at this angle. Detective Mermini saw Anderson get out of his vehicle and saw he was wearing a white shirt and black pants. Detective Mermini then began calling out a description of Anderson and Anderson's car (a black Lexus) on the covert radio.

Detective Mermini watched Anderson walk around Detective Mermini's vehicle to observe it and saw Anderson looking at the rear of his own vehicle. Detective Mermini could neither testify to what Anderson saw when he looked at the vehicles nor whether Anderson knew someone was in Detective Mermini's vehicle. Detective Mermini did not get out of his vehicle or do anything to see if Anderson was okay. Anderson then got back in his car and began driving through the parking lot.

Detective Mermini continued speaking on the radio, informing Sergeant Seely and the other detectives in the parking lot where Anderson was going. Then, Detective Mermini heard that Detective Justin Williams saw Anderson's car park again in the same complex.[6] Detective Mermini heard Detective Williams over the radio stating that he observed Anderson walking down the stairs from an apartment, lifting his shirt, and revealing a firearm concealed in Anderson's waistband.[7] "They" then told Detective Mermini to leave because "they" believed that Anderson was coming back to where Detective Mermini was and that it could "create a situation."[8]

At that time, Detective Mermini drove his vehicle out of the area under the orders of Sergeant Seely. He parked by the management office of the complex. Here, he got out of his vehicle for the first time since the accident. Once he knew that detectives were following Anderson out of the complex, Sergeant Seely told him it was safe for him to go back and continue surveillance (because the SWAT team was still on its way).

---

[6] For ease of reference, the court refers to this location as stop two.
[7] Detective Mermini never saw Anderson with a gun.
[8] Detective Williams later testified that he told Detective Mermini to leave his spot.

Detective Mermini requested medical attention at some point. He explained that when he was hit, he knew the impact did not break his back. He felt pain but did not know how bad it would be. However, he knew it could be worse later. So, as a precaution, he had an ambulance come check it out. Medical personnel looked at him and suspected he would just have lower back pain. Detective Mermini did not think it was necessary to go to the hospital at that time and that the pain "would likely be minor." He did not require any additional medical attention and the pain went away a day or so later.

After Detective Mermini was seen by medical (and after the search warrant was executed), the traffic unit arrived. Detective Mermini showed them the front of his car. He observed them take pictures of his vehicle. "They took pictures" and documented all the damage to the vehicle, which was "minor." Detective Mermini described the damage as "a few scratches" on the front bumper.

A traffic report of the accident was created. Defense Ex. LL. It noted only that Detective Mermini's vehicle had "minor damage" but did not further describe it.[9] *Id.*

### ii.    Detective Justin Williams

Detective Justin Williams testified next. He testified as follows.

Detective Williams has been employed by LVMPD for almost ten years. He is a detective in the narcotics section. He works in a covert capacity.

On the day in question, he was assigned to do surveillance on the residence where they would be executing a search warrant. He arrived around 3:40 p.m. in an unmarked vehicle and was set up on the east side of the target apartment. His role was to apprehend anyone who left the apartment, which Detective Mermini would call out over the covert radio.

During surveillance, Detective Mermini advised on the covert channel that he was backed into by another vehicle. He described the vehicle and the individual who got out of the vehicle. Detective Mermini also advised that the individual (Anderson) was driving east in the parking lot.

---

[9] No pictures of Detective Mermini's vehicle appear to exist. *See* ECF No. 43 at 11 (email from AUSA to defense counsel noting that "there are no photographs of Mermini's vehicle that I am aware of.").

Detective Williams was already parked to the east (at stop two) and saw the vehicle pull up next to him, about three spaces away. The car was a black Lexus.

Detective Williams observed a man (who he later identified in court as Anderson) exit the Lexus. Anderson went upstairs to an apartment and knocked on the door. A woman answered, and they had a brief conversation. Anderson then walked back down the stairs. As he walked down the stairs, he lifted his shirt. Detective Williams saw a black and grey firearm in his waistband, which Anderson retrieved. As he did this, Detective Williams got on the radio and told Detective Mermini to get "out of that spot" (stop one) because he thought Anderson was coming back to "that area."[10] Anderson then walked to his Lexus, went to his trunk, and then got back in the driver's seat. At that point, he was not holding the gun.

After Anderson got back in his vehicle, he headed south in the parking lot and turned left/east (away from where the accident occurred). Detective Williams followed him. Anderson then pulled over again into another parking space (stop three). Detective Williams passed him and saw Anderson exiting the vehicle again. As Detective Williams passed Anderson, he radioed for someone else to maintain constant surveillance on him. Detective Williams did not want to stop and make Anderson suspicious that someone was watching him. Detective Williams then parked by the office in the apartment complex. Within minutes, Detective Williams watched Anderson pass him and leave the complex. Detective Williams followed him, as did Detective Riley in a separate vehicle.

They followed Anderson to a separate apartment complex (Siegal Suites). Once Anderson pulled into this complex, Detective Williams pulled into the next entrance. Detective Williams then watched a marked police unit stop Anderson. At this time, Detective Williams exited his vehicle and walked to where Anderson was stopped. Detective Williams then called Detective Riley to confirm that police had the right person in custody, which he believes Detective Riley conveyed to Sergeant Seely. Detective Williams testified that Anderson was being detained at this time for the hit and run traffic violation.[11]

---

[10] Detective Williams did not know anything about Anderson at this point, including whether he had a permit to carry a concealed weapon.

[11] Government Ex. H shows Detective Williams on the scene where Anderson was taken into custody.

After Detective Williams identified Anderson, SWAT was ready to execute the search warrant. Sergeant Seely asked Detective Williams to come back to assist with the execution of the search warrant, which he did. But Sergeant Seely made the decision at that time that Anderson would be detained until after the search warrant was executed. Once the search warrant was executed, Detectives Williams and Riley went back to search Anderson's vehicle.

Detective Williams testified that typically, when a vehicle search is conducted, they break the vehicle into four quadrants, which they did in this case. They started on the driver's side, then searched behind the driver's seat, the trunk, the back-passenger's seat, passenger's seat, and the hood. Detective Williams did not know where the firearm would be but knew it had to be in the vehicle. He testified he did not recall having to search the vehicle multiple times to find the gun. Eventually, they located a firearm beneath the hood of the vehicle. He said they did not immediately locate the firearm because they searched the vehicle in quadrants but immediately located it once they searched the hood. It was the same firearm he saw Anderson display earlier.

When asked what Detective Williams did to develop probable cause to search Anderson's vehicle, he testified, "I observed him with a firearm."

### iii.    Officer Avalos

Officer Jasmine Avalos testified next. She testified as follows.

Officer Avalos has worked for LVMPD for about four and a half years. She works in the patrol division.

On the day in question, she was on patrol in a marked patrol vehicle. She was working with her partner, Officer Sims. She heard over the radio that an undercover detective's vehicle was struck by another vehicle that fled the scene. She got a description of the vehicle, which was an older black Lexus. She received information about the vehicle's whereabouts and located it very shortly thereafter at Siegel Suites near Hazelwood and Twain. The subject (who she later identified to be Anderson) matched the description given over the radio. He was standing outside of the Lexus when she and Officer Sims arrived.

Officers Sims and Avalos immediately detained Anderson, and Officer Sims handcuffed him. Officer Sims conducted a pat-down but did not locate any weapons on Anderson. Officer Avalos understood that they were detaining him because he had just "committed a hit and run."

Officer Avalos asked Anderson if he had identification. Anderson said he had a state ID that was in his wallet. Officer Avalos testified that she asked if Officer Sims could retrieve the ID, and Anderson said "yes." Government Exhibit H shows this interaction.[12] Officer Sims retrieved the ID out of Anderson's pocket, and Officer Avalos ran his local SCOPE. She did this within minutes of initially detaining him. She discovered that he had multiple felonies.[13]

She did not search Anderson's vehicle, nor did any patrol officers. She understood moments into detaining Anderson that narcotics detectives were going to come back to search Anderson's vehicle.

At some point, Detectives Williams and Riley returned to search Anderson's vehicle. Officer Avalos testified that Government Exhibit J is her body camera footage. She testified that Detectives Williams and Riley are on the scene of Anderson's stop and at that point, they had completed the search of his car.

Around the end of the search, the traffic unit arrived on scene. Officer Avalos took pictures of Anderson's vehicle in relation to the traffic accident at the traffic unit's direction.

### iv.    Detective Grant Riley

Detective Grant Riley testified next. He was the case agent and had been sitting at counsel's table during every witness's testimony. He testified as follows.

Detective Riley has been employed by LVMPD for the last 13 years. He is currently a detective in the narcotics unit. He works in an undercover capacity.

On the day in question, he was given surveillance responsibilities. He believes he arrived between 3:30 p.m. and 3:45 p.m. He was positioned in the parking lot of a gas station on the east side of University Center (at the northeast corner of University and Flamingo). He was in an unmarked car that day. His job was to conduct surveillance and to apprehend anyone related to

---

[12] In it, Officer Avalos does not ask Anderson's permission to retrieve his ID, nor does he grant consent.
[13] Government Exhibit H is Officer Avalos' body camera footage of Anderson being stopped. The exhibit depicts her running Anderson's SCOPE and determining that he is a convicted person.

the execution of the search warrant that detectives wanted stopped, so the search warrant could be safely executed.

Just before the search warrant was to be executed, he heard Detective Mermini on the radio "frantically" stating that his vehicle had just been struck.

When he heard that Detective Mermini was hit and that the driver fled the scene, he began driving into the apartment complex. No one directed him to do this. He could hear it was a "dynamic" situation that "needed more eyes" so he decided to go in "because the situation had rapidly changed."

It was Detective Riley's understanding that Detective Williams was nearby and that as the vehicle left the accident, Detective Williams "immediately" gained surveillance over "this." This was so because the vehicle parked nearby, and the man got out of the car. Detective Williams then updated Detective Riley that the individual went upstairs, contacted someone, walked downstairs, and retrieved a firearm from his waistband. Detective Riley recalled that Detective Williams told Detective Mermini to leave his location at this point.[14]

Detective Williams then gave directions regarding where the individual was driving. Detective Williams indicated that his location was east of where the target apartment was. Detective Riley knew that there was a drive/street east of there (from having worked the location for years). Accordingly, Detective Riley started driving southbound (in that drive).

Detective Riley then gave different accounts of what happened when he first saw Anderson.

In Detective Riley's arrest report, he wrote:

> Anderson displayed the firearm for several seconds. Det. Williams then observed Anderson opening the trunk area of the Lexus. I Det. Riley P#13428 arrived in the area and established surveillance on Anderson.[15] Anderson appeared to be nervously looking around the area and parking lot. I observed Anderson opening the front hood of the Lexus. Anderson appeared to be moving items around in the left side engine block area under the hood. After a few seconds, Anderson shut the

---

[14] Detective Riley understood that Detective Franco then moved to cover Detective Mermini's position (as the eye on the door to the target apartment).

[15] According the report, it appears Detective Riley observed Anderson at stop two. In addition, the report does not mention stop three.

1
2

hood and re-occupied the Lexus. Detectives maintained constant surveillance on Anderson in the Lexus as he drove eastbound out of the complex.

3

Defense Ex. FF.

4
5
6
7
8
9
10
11
12
13

On direct, Detective Riley testified that as he turned south down that drive (at stop two, where Detective Williams saw Anderson display the gun), Anderson started to back out. Detective Riley followed Anderson. Anderson went south and then east and parked "immediately" at stop three. Detective Riley went approximately three spaces to the left and parked.[16] Just before Detective Riley parked, Detective Riley observed Anderson. "He appeared to be very frantic; appeared to be head on a swivel."[17] "The driver's door was left open; the trunk was popped, as was the hood."[18] Then Detective Riley observed Anderson being interested in doing something in the hood. Based on his training and experience, he believed that Anderson may have been concealing an item. "After a few seconds of him appearing to scramble," Anderson got back in the car, backed out, and headed eastbound.

14
15
16
17
18
19
20
21
22

On cross, Detective Riley confirmed that his arrest report did not say anything about Anderson moving to a third location (after Detective Williams saw him with the gun at stop two). When asked to confirm that his arrest report did not say "anything about Anderson having both the trunk and the hood open at that time when [Detective Riley] saw him" (as Detective Riley had already testified to), Detective Riley stated, "by the time I turned in, he was getting to that third stop." When asked to confirm again that Detective Riley did not include in his arrest report that Anderson moved from the second stop (where Detective Williams saw Anderson display the gun) to the third stop, Detective Riley stated, "I didn't know that, no. All I did was arrive and see him pulling out and parking in and opening up the hood and the trunk."

23
24
25

Regarding Detective Riley's testimony on direct that Anderson had his "head on a swivel," Detective Riley was asked whether it seemed odd to him that Anderson was frantically looking around to see who was watching him when he had allegedly just been openly displaying a

26
27
28

[16] When asked if there were any cars in between him and Anderson, Detective Riley stated, "low-profile, maybe two cars."
[17] Detective Riley stated that "head on a swivel" is a term used to mean looking around frantically, turning to see who was watching his actions.
[18] According to this testimony, it appears that when Detective Riley saw Anderson at stop three, the hood and trunk were already open.

1  firearm. Detective Riley first responded, "he just looked panicked to me." Then he explained that

2  he thought Anderson had caught on to the fact that Detective Williams was following him.

3  Defense counsel then asked, "so you thought that [Anderson] had realized Detective Williams

4  was following him so he decided to pull over?" Detective Riley immediately answered, "no."

5  Defense counsel continued, "and open the hood and the trunk and quickly and?" Detective Riley

6  interjected with: "Conceal an item? Yes." Defense counsel continued, "Because that would be the

7  way to avoid arousing the suspicion of the officer?" Detective Riley answered, "Absolutely."

8    Detective Riley testified that he maintained a visual on Anderson until Anderson left the

9  apartment complex (and headed north on University Center). At that point, Detective Riley lost a

10  visual on Anderson but knew other detectives were maintaining surveillance. Detective Riley

11  testified that Detective Williams followed Anderson as the main "eye," and Detective Kendrick,

12  Sergeant Seely, and himself also followed where Anderson was going.[19]

13    Detective Riley testified that he ended up seeing the Lexus again at Siegal Suites (around

14  Hazelwood and Twain). In Detective Riley's arrest report, he wrote, "I observed Anderson

15  exiting the vehicle, at which time marked Patrol Officers . . . conducted a person stop on him

16  immediately . . . ." Defense Ex. FF. However, Detective Riley testified that he did not lay eyes on

17  Anderson at this time. Instead, he parked 30 yards north and "out of view." After Detective

18  Williams walked by where Anderson was detained, he called Detective Riley to let him know that

19  the individual police stopped was the individual they were following.

20    At that point, in Detective Riley's mind, they were investigating a felony hit and run with

21  injury and property damage. Detective Riley had heard that Detective Mermini was injured and

22  did not know what type of damage was done to his vehicle.

23    Additionally, Detective Riley testified they "clearly [had] reasonable suspicion to

24  definitely talk to this individual based on him concealing a firearm in his waistband." He testified

25  that they were in a high crime area, and it is common for people to carry firearms in that area,

26  most of the time, illegally. Later, on cross, Detective Riley testified that the area did **not** inform

27

28  [19] Detective Riley testified that four or five detectives were on scene that day for the search warrant and a Sergeant. Two people were left at the apartment complex and the rest left to follow Anderson.

his thoughts about Anderson. His thoughts about Anderson were informed by the "actions; it was the concealment, it was the leaving the scene of an accident; it was the frantically looking around the vehicle; and then eventually placing it in the front of the engine block."[20] Then Detective Riley testified that the fact that the area is a high crime area **was** relevant. He testified that individuals with firearms get stopped daily in this area and murders are committed there. But then he testified that this information did **not** inform his thoughts about Anderson. Detective Riley testified that when he stated on direct that it was a high crime area, he was just stating his experience as an officer.

Once Detective Williams advised that patrol officers had the correct individual stopped, Detective Riley called Sergeant Seely and asked him what he wanted them to do. "Do you want us to stay here, start searching this vehicle?" Sergeant Seely said "no" and asked Detective Riley to come back and assist with the execution of the search warrant. Accordingly, Detective Riley went back to his original location at the gas station.

After the search warrant was executed, Detective Riley began debriefing people who were taken into custody as a result of the warrant. However, Sergeant Seely then walked up to Detective Riley, told him that Anderson had multiple felonies, and asked him to go "help patrol officers with the search of that vehicle and the subsequent arrest, if it's going to be made."

Detective Riley then immediately went back to where Anderson was stopped with Detective Williams. When they arrived at Anderson's vehicle, one of the detectives had a brief conversation with the patrol officer. The patrol officer said that Anderson was a felon, so Detective Riley knew they were investigating more than just a hit and run, "if we ended up locating a firearm."

Detectives Williams and Riley began searching the vehicle.[21] Detective Riley testified that they did the search methodically in quadrants. At the very end, they got to the hood. The hood

---

[20] It is worth noting that Detective Riley never testified that he observed Anderson putting the gun under the hood.
[21] On cross, Detective Riley testified that Detective Williams was going to talk to patrol officers while Detective Riley started the search. Detective Williams was figuring out who they were dealing with. Detective Riley testified that he and Detective Williams already knew Anderson was a seven-time felon, but that was all they knew. Detective Williams talked to the police officers to confirm that Anderson was a felon before the search. Detective Riley then volunteered that it "didn't matter" whether they got this information before or after the search, as Anderson was "under arrest." He was under arrest when he was initially taken into custody (at 4:03) for the hit and run felony. This

was of interest to Detective Riley because he saw Anderson in the hood at the first apartment complex. Detective Riley popped the hood and immediately noticed a plastic cover on the left was loose, as if it had been opened before. As soon as he moved it, he saw a t-shirt. Based on his training and experience, he believed the gun Detective Williams had seen was going to be inside the t-shirt. Detective Riley then testified he unwrapped the t-shirt and discovered the firearm. He then asked a patrol officer to take pictures.

Detective Riley testified that after the firearm was discovered, Anderson was arrested.

Detective Riley also testified that he wrote the arrest report for Anderson's arrest. He received information from other people that helped him prepare the report, as he had not witnessed the accident or Anderson displaying the firearm.

In the report, Detective Riley provided supplemental information to support detectives' probable cause for this case. Defense Ex. FF. In this section, Detective Riley wrote, "It is my belief that Anderson continues to possess firearms for felonious activities." *Id.* When asked if Detective Riley actually believed this when Anderson was arrested, Detective Riley stated, "it's boilerplate." When pressed whether Detective Riley specifically believed that *Anderson* continued to possess firearms for felonious activities, Riley stated, "yes." When asked again if, at the time of Anderson's arrest, Detective Riley believed that Anderson continued to possess firearms for felonious activities, Detective Riley admitted, "No. That was just. That's supplemental information for probable cause is all that is. It has nothing to do specifically with him [Anderson] . . . ."

Detective Riley also acknowledged that the LVMPD unit log (Defense Ex. EE) initially listed Anderson's incident as a 401(A), meaning hit and run, starting at 4:04 p.m. It was changed from a 401A (hit and run) to a 401(B) (accident with injury) at 4:51 p.m. Detective Riley said that how dispatch characterizes incidents is a common problem but acknowledged that how dispatch characterizes it is based on what detectives tell them (but it is delayed information).

---

was Detective Riley's understanding. He also testified that the decision was made when Anderson was arrested (for the traffic offense) that Anderson's car would be searched.

### v.    Mr. Lucious

Mr. Ray Lucious testified next. He testified as follows.

Mr. Lucious is Anderson's father. He came to the scene where Anderson was detained. He became aware that his son was stopped because his ex-girlfriend was the manager at Siegel Suites, saw that Anderson was stopped, and informed Mr. Lucious.

Mr. Lucious went to the scene and saw his son was already in the police vehicle. Officers were waiting for other officers to come search Anderson's vehicle. He was also present when officers searched Anderson's vehicle.[22] Officers searched the car three or four times. He observed them going to the hood at least three times to search. They searched the hood initially, did not find anything, and put the hood back down. He specified that the hinges on Anderson's hood are broken, so the hood must be propped open with a stick. When officers did not find anything after their first search of the hood, they removed the stick and put the hood back down. He testified that he observed one officer, who was white, search the hood three times.[23] Another officer then showed up and they decided to search the car together. On the third search, they found something in the hood.

### vi.    Other Evidence

Several exhibits from both the government and Anderson were admitted into evidence. The Court will reference these exhibits as is relevant to the Court's analysis below.

## III.    The Court's Findings of Fact

There are several inconsistencies in the evidence before the Court. Witnesses were, at times, inconsistent with themselves, with other witnesses, and with exhibits admitted into evidence. As such, and perhaps more than in other cases, the Court was forced to make adverse credibility determinations. The Court did not do so lightly and understands the seriousness of finding officers to not be credible. However, in this case, the evidence compelled the Court to find that some officers were not entirely credible. In making this finding, the Court does not find that they were necessarily intentionally untruthful with the Court. Rather, at least some of the

---

[22] Mr. Lucious can be seen on various body camera footage, including Defense Ex. AA 401B-21, when the search was allegedly completed.
[23] Detective Riley is white, and Detective Williams is African American.

credibility issues appear to stem from mistakes or a lack of attention to detail; others stem from serious embellishments. Still, the Court must and did consider all these issues in trying to determine what happened the day Anderson was arrested. Based on these credibility determinations and the evidence, the Court makes the following findings of fact.

### A.    The Accident

Detective Mermini testified first. The Court found some of his testimony to be credible and some of it to not be credible.

On the day in question, Detective Mermini was assigned to be the "eye" for a search warrant that was going to be executed on an apartment at 4055 University Center in Las Vegas, Nevada. His job was specifically to watch the door of the apartment.

While surveilling, Detective Mermini was sitting in his undercover car. Anderson's car was parked in front of Detective Mermini's car, a couple feet away. Another car was parked behind Detective Mermini's car.

At some point, Anderson walked to his car. He then backed into Detective Mermini's car, making some contact. The evidence in the record (e.g., the detectives' testimony, the CAD, the recorded dispatch line, the fact that traffic reports were created), supports the conclusion that some contact occurred between Anderson's vehicle and Detective Mermini's vehicle. Of the witnesses who testified, only Detective Mermini witnessed this accident.

Based on the damage that Detective Mermini's car sustained (at most, minor scratches),[24] the Court does not find that Detective Mermini heard Anderson "rev" his engine or squeal his tires before backing into Detective Mermini. Again, based on the amount of damage alleged (a few minor scratches), the Court does not find that Detective Mermini was slammed into his seat, felt immediate pain, or was injured. The Court finds it implausible that if Detective Mermini's car sustained only a few minor scratches, Detective Mermini would have been slammed into his seat and injured. Put another way, if Anderson did "rev" his engine, squeal his tires, and back into

---

[24] The Court will discuss later whether it finds that Detective Mermini's car was, in fact, damaged at all. However, for purposes of these findings, the Court notes that Detective Mermini only alleged that the accident caused a few minor scratches to his car. The Court finds no reason to believe that Detective Mermini would *downplay* the damage to his vehicle.

Detective Mermini with such force that he was immediately injured, the Court would expect more damage to Detective Mermini's vehicle and at least some damage to the car parked behind Detective Mermini's. There was no testimony of any impact or damage to the car behind Detective Mermini's.

**B.     Whether Detective Mermini Reported Experiencing Pain Immediately**

After Anderson hit Detective Mermini, Detective Mermini got on the covert radio to advise Sergeant Seely that his vehicle had just been struck by another vehicle. The Court does not find that Detective Mermini told Sergeant Seely at this time about his alleged back pain.

The evidence that supports the notion that Detective Mermini immediately told Sergeant Seely about his back pain is Detectives Mermini and Riley's testimony, as well as Detective Riley's arrest report. However, all this evidence suffers from credibility problems. As discussed in more detail below, the Court does not find Detective Riley credible or his arrest report to be a reliable and accurate representation of what occurred the day Anderson was stopped. Regarding Detective Mermini, the Court already found Detective Mermini's testimony regarding the injury he sustained to be not credible; if Detective Mermini's car sustained only minor scratches (at most), it is implausible that Detective Mermini would be slammed into his seat and injured.

Further, Detective Mermini gave inconsistent testimony about his injury. He testified that immediately after the accident he was "hurting pretty good" so "[he] made sure to tell" Sergeant Seely. However, he also testified that he called the ambulance as a "precaution" and that he thought the pain would only be minor. Relatedly, and as discussed in more detail below, Sergeant Seely did not immediately report that Detective Mermini was experiencing pain (but rather, reported that Detective Mermini first reported pain about 45-minutes after Anderson had been stopped). Accordingly, there is no credible evidence suggesting Detective Mermini immediately reported his alleged injury to Sergeant Seely. This conclusion is bolstered by the government's response brief, in which it takes the position that Detective Mermini reported back pain later, within an hour of the accident. ECF No. 40 at 2, 6.

Additionally, multiple other pieces of evidence (created closer in time to the accident) suggest that Detective Mermini did not report feeling pain immediately after his car was hit. For

example, Sergeant Seely reported to dispatch at 4:06 p.m. that Detective Mermini did not need medical and that he was not a victim of "anything." *See* Defense Exs. BB (radio traffic); DD (CAD at 16:06:30). Approximately forty-two minutes later, Sergeant Seely reported to dispatch that Detective Mermini needed medical as, "he's *now* saying he's got a little bit of lower back pain." Exs. BB (radio traffic) (emphasis added); DD (CAD at 16:48:38). Additionally, the accident was recorded as a "401A" (hit and run) until after Sergeant Seely reported at 4:48 p.m. that Detective Mermini was *now* saying he had a little bit of lower back pain; at this time, the accident type changed to a "401B," which means "accident with injuries." *See* Defense Exs. EE (accident reported as 401A until 16:51:58, at which time it was switched to a 401B); JJ (providing definitions for "401A" and "401B").[25] Accordingly, based on all the evidence (and all the credibility problems with certain evidence), the Court does not find that Detective Mermini reported his alleged back pain right after the accident. The Court finds it more likely that Detective Mermini reported feeling a little bit of pain approximately forty-two minutes after the accident, at which time Sergeant Seely reported this to dispatch.

### C.    Whether Detective Mermini Knew His Car Was Damaged Immediately After the Accident

After Anderson's car hit Detective Mermini's car, Anderson parked and got out of his car. Detective Mermini observed Anderson look at both vehicles. Detective Mermini then began calling out a description of Anderson and his car on the covert radio. Anderson got back in his vehicle and began driving. Detective Mermini continued speaking on the covert radio, telling officers where Anderson was going.[26]

The Court finds that Detective Mermini did not get out of his car immediately after the accident to see if either vehicle was damaged. Detective Mermini admitted this in his testimony. Further, there is no evidence that Detective Mermini (or any other officer) looked at Detective

---

[25] The Court also notes that a recorded line with dispatch was not set up until after Anderson was allegedly seen with a gun. If Detective Mermini really reported to Sergeant Seely that he was involved in a hit and run and was hurting badly, it seems odd that a recorded line would not have been set up at this time to report the incident.

[26] Based on the evidence in the record, it is unclear to the Court whether Detective Mermini moved his vehicle after Detective Williams saw Anderson with a gun (as detectives testified to) or whether Detective Mermini stayed put (as Sargent Seely indicated to dispatch). *See* Ex. BB (dispatch recording). It is not necessary for the Court to decide this fact to decide this motion; however, it is yet another example of the many inconsistencies in the evidence.

Mermini's car to see if there was any alleged damage before Anderson was stopped and taken into custody.

### D. Whether Detective Mermini Was Injured as a Result of his Accident with Anderson

There is insufficient evidence in the record for the Court to find that Detective Mermini was injured. Other than Detective Mermini's testimony that he felt pain (which the Court already found to be not credible), there is no evidence in the record that Detective Mermini was injured. For example, no medical records were submitted into evidence to indicate what medical professionals observed when they examined Detective Mermini.

Additionally, as explained above, Detective Mermini's own testimony about the injury he sustained is inconsistent. Detective Mermini testified that immediately after the accident he was "hurting pretty good" so "[he] made sure to tell" Sergeant Seely. However, he also testified that he called the ambulance as a precaution and that he thought the pain would only be minor. Additionally, when Sergeant Seely was asked by dispatch whether dispatch should set up a separate "422" code (meaning "injured officer"), Sergeant Seely said no. *See* Defense Exs. DD (CAD at 17:11:22 noting negative to separate 422); BB (radio traffic); JJ (defining "422").

Further, and as discussed above, the Court does not believe that a rear-end collision that causes, at most, minor scratches would slam a driver into his seat and cause a back injury. Accordingly, the Court does not find that there was sufficient evidence offered to establish that Detective Mermini was injured by Anderson bumping into his car.

### E. Whether Detective Mermini's Car was Damaged as a Result of his Accident with Anderson

Based on the evidence in the record, it is unclear whether Detective Mermini's vehicle was damaged. The only evidence in the record that Detective Mermini's vehicle was damaged was his testimony and the traffic report. As previously discussed, the Court already found Detective Mermini's testimony about the accident to not be entirely credible. The traffic report adds little detail for the Court to consider, noting only that Detective Mermini's vehicle had minor damage. Defense Ex. LL. The traffic report does not provide any further information about

this damage (e.g., that it was scratches, scrapes, dents, etc.). *See id.* More problematic for the Court, however, is the absence of pictures of Detective Mermini's vehicle. Detective Mermini testified that he watched the traffic unit take pictures of his vehicle, but an attorney for the government previously stated that "[t]here are no photographs of Mermini's vehicle that I am aware of." ECF No. 43 at 11. Accordingly, either Detective Mermini did not observe traffic taking pictures of his vehicle or the pictures were destroyed (intentionally or unintentionally). On the record before the Court, the Court does not know whether pictures were taken at all and if so, whether they were destroyed intentionally or unintentionally. As such, there is insufficient evidence for the Court to determine whether Detective Mermini's car was damaged or not.

**F.      Whether Anderson's Vehicle Was Damaged as a Result of His Accident with Detective Mermini**

The Court also finds that there is no evidence that Anderson's vehicle was damaged by the accident with Detective Mermini. While there are photographs in the record of Anderson's vehicle, showing minimal damage, no evidence was introduced that the accident caused that damaged. In other words, no one could say whether the damage to Anderson's vehicle existed before he bumped into Detective Mermini's vehicle.

**G.      Detective Williams' Observations**

The Court finds Detective Williams' testimony credible. On the day in question, Detective Williams was assigned to do surveillance on the residence where they would be executing a search warrant. He parked on the east side of the target apartment in an unmarked vehicle, at stop two.

During surveillance, Detective Williams heard Detective Mermini advise on the covert channel that he was backed into by another vehicle. Detective Williams heard Detective Mermini described the vehicle and the individual who got out of the vehicle. Shortly thereafter, Detective Williams saw the black Lexus pull up a few spaces away from him and saw Anderson exit the vehicle. Detective Williams watched Anderson go upstairs to an apartment, knock on the door, and have a brief conversation with a woman. Anderson then went down the stairs, lifted his shirt,

retrieved a firearm, and walked to his Lexus. Anderson went to the trunk and then got back in the driver's seat. At that point, Detective Williams did not see the gun.

After Anderson got back in his vehicle, Detective Williams saw him drive south in the parking lot and turn left/east. Detective Williams followed him. Anderson then pulled over again into another parking space, at stop three. Detective Williams passed him and saw Anderson exiting the vehicle again. As Detective Williams passed Anderson, he radioed for someone else to maintain surveillance on him. Detective Williams then parked by the office in the apartment complex. Within minutes, Detective Williams watched Anderson pass him and leave the complex. Detective Williams followed him.

Once Anderson pulled into Siegel Suites near Hazelwood and Twain, Detective Williams pulled into the next entrance. Detective Williams watched as officers stopped Anderson. He then called Detective Riley to confirm that police had the right person in custody, which he believes Detective Riley conveyed to Sergeant Seely. At this time, Detective Williams understood that Sergeant Seely made the decision that Anderson would be detained while they executed the search warrant and then Detectives Williams and Riley would return to search Anderson's car. At this point, no one knew whether Anderson had a permit to carry a concealed weapon or whether he had any prior felonies. The only thing Detective Williams did to develop probable cause to search Anderson's vehicle was "observe[] him with a firearm."

Once the search warrant at the University Center location was executed, Detectives Williams and Riley returned to search Anderson's car. Detective Williams (along with Detective Riley) searched the vehicle in quadrants, ending with the hood. They located a firearm in the hood.

### H.    Officer Avalos' Observations

The Court found Officer Avalos' testimony to be credible, with one exception.[27] On the day in question, Officer Avalos was on patrol in a marked patrol vehicle. She was working with her partner, Officer Sims. She heard over the radio that an undercover detective's vehicle was

---

[27] Officer Avalos did not testify consistent with her body camera footage. She testified that she asked Anderson for permission to retrieve his ID, which he gave. The body camera footage does not appear to show that she asked for Anderson's permission or that he gave it.

struck by another vehicle that fled the scene. She got a description of the vehicle, which was an older black Lexus. She received information about the vehicle's whereabouts and located it very shortly thereafter at Siegel Suites. She observed Anderson standing outside of the Lexus when they arrived.

Officers Sims and Avalos immediately detained Anderson, and Officer Sims handcuffed him. It was approximately 4:02 p.m. Officer Sims conducted a pat-down but did not locate any weapons on Anderson. Officer Avalos understood moments into detaining Anderson that narcotics detectives were going to come back to search Anderson's vehicle.

Officer Avalos asked Anderson if he had identification. Anderson said he had a state ID that was in his wallet. Officer Sims retrieved the ID out of Anderson's pocket but did not seek Anderson's consent. Officer Avalos then ran his local SCOPE at approximately 4:06 p.m. and discovered he had multiple felonies. Ex. H.

**I.   Detective Riley's Observations**

The Court finds Detective's Riley testimony to be not entirely credible. As the Court will discuss, there were several internal inconsistencies in Detective Riley's testimony and inconsistencies between his testimony, his arrest report, and other witnesses' testimony. Additionally, he was very defensive while testifying. As explained below, the Court believes some of Detective Riley's testimony; however, the Court finds other portions of Detective Riley's testimony less credible. Against this backdrop, the Court makes the following findings.

On the day in question, Detective Riley was given surveillance responsibilities. He was assigned to the parking lot of a gas station at the northeast corner of University and Flamingo. He was in an unmarked car that day. His job was to conduct surveillance and to apprehend anyone related to the search warrant that detectives wanted stopped.

Just before the search warrant was to be executed, Detective Riley heard Detective Mermini on the radio stating that his vehicle had just been struck. The Court does not believe that Detective Mermini was frantic, as Detective Riley testified. This does not comport with any other evidence in the record. Neither Detective Mermini nor Detective Williams indicated that Detective Mermini was frantic, panicked, etc. Detective Mermini also testified that he advised

Sergeant Seely (and others listening to the covert channel) that he would maintain his position of surveillance, because the search warrant was going to be executed shortly. Additionally, as already discussed, the Court believes that Anderson's car only slightly bumped into Detective Mermini's car and that Detective Mermini did not immediately report any pain or injury. Accordingly, the Court finds it implausible that Detective Mermini would be frantic on the radio from another car slightly bumping into him.

Detective Riley testified that when he heard that Detective Mermini was hit, he began driving into the apartment complex because it was a "dynamic" situation that "needed more eyes" so he decided to go in "because the situation had rapidly changed." No one directed Detective Riley to do this. The Court does not know if this is the point in time when Detective Riley began driving into the area. It seems odd, if not implausible, that Detective Riley would feel that this occurrence warranted him leaving his assigned position for a search warrant that was about to be executed. Additionally, Detective Riley's testimony about what he saw and when he first observed Anderson once he got inside the apartment complex is inconsistent (as the Court will discuss below). Accordingly, the Court does not know what to believe about when and why Detective Riley left his assigned position at the gas station. While it is possible he left when he heard Detective Mermini was hit, the Court finds it equally (if not more) plausible that he entered the apartment complex either (1) after Detective Williams saw Anderson with the gun or (2) when Detective Williams radioed for someone to maintain surveillance on Anderson (after Anderson parked at stop 3 and Detective Williams passed him).

Based on Detective Riley's different accounts of what happened next and when he first saw Anderson, the Court is unsure about what Detective Riley observed. As previously noted, Detective Riley gave different narratives about where he first saw Anderson and what he observed.

In Detective Riley's arrest report, it appears that Detective Riley arrived at stop two (where Detective Williams sees Anderson with the gun) when the trunk is already open. *See* Defense Ex. FF. Then Detective Riley reports watching Anderson appear nervous and opening

the hood of his car (still at stop two). *See id.* Then, Anderson shut the hood and left the apartment complex.[28] *See id.*

On direct, Detective Riley testified to seeing something else. Detective Riley testified that as he turned south down that drive (where Detective Williams saw Anderson with the gun/stop two), Anderson started to back out. Detective Riley followed Anderson. Anderson went south and then east and parked at stop three. Just before Detective Riley parked, he observed Anderson. "He appeared to be very frantic; appeared to be head on a swivel." "The driver's door was left open; the trunk was popped, as was the hood." Then Detective Riley observed Anderson being interested in doing something in the hood. Based on his training and experience, he believed that this individual may have been concealing an item. "After a few seconds of him appearing to scramble," Anderson got back in the car, backed out, and headed eastbound.

On cross, instead of stating that he saw Anderson parked at stop two or backing out of stop two, Detective Riley stated, "by the time I turned in, he was getting to that third stop." When asked to confirm that his arrest report did not say anything about Anderson moving from stop two to stop three, Detective Riley stated, "I didn't know that, no. All I did was arrive and see him pulling out and parking in and opening up the hood and the trunk."

There are a few inconsistencies in these various narratives. And these inconsistencies relate to a critical moment in the case; the most crucial facts underlying reasonable suspicion for the illegal possession of a firearm take place when Detective Riley sees Anderson. The first inconsistency is when Detective Riley first sees Anderson. The arrest report suggests that Detective Riley first sees Anderson at stop two, as Detective Williams is observing Anderson

---

[28] This portion of the arrest report reads as follows:

> Anderson displayed the firearm for several seconds. Det. Williams then observed Anderson opening the trunk area of the Lexus. I Det. Riley P#13428 arrived in the area and established surveillance on Anderson. Anderson appeared to be nervously looking around the area and parking lot. I observed Anderson opening the front hood of the Lexus. Anderson appeared to be moving items around in the left side engine block area under the hood. After a few seconds, Anderson shut the hood and re-occupied the Lexus. Detectives maintained constant surveillance on Anderson in the Lexus as he drove eastbound out of the complex.

Defense Ex. Ex. FF.

with the trunk open. *See* Defense Ex. FF. However, Detective Riley testified on direct that he first saw Anderson backing out of his parking spot at stop two.[29] On cross, Detective Riley stated, "by the time I turned in, he was getting to that third stop." Additionally, Detective Riley's testimony about when the trunk and hood are opened and who sees this is inconsistent. In the arrest report, Detective Riley writes that Detective Williams "observed Anderson opening the trunk area of the Lexus," and Detective Riley "observed Anderson opening the front hood of the Lexus." Defense Ex. FF. On direct, Detective Riley testified that when he was about to park at stop three, he observed that the "the driver's door was left open; the trunk was popped, as was the hood." On cross, Detective Riley stated that he saw Anderson "opening the hood and the trunk." Based on these inconsistencies, the Court is unsure what Detective Riley witnessed when he first saw Anderson and where he saw it.

The Court is also unsure whether Detective Riley saw Anderson looking nervous (as noted in the arrest report) and/or whether his "head [was] on a swivel" (as Detective Riley testified to).

First, the Court is unsure whether Detective Riley saw Anderson looking nervous, as he wrote in the arrest report, for multiple reasons. As an initial matter, Detective Riley admitted that he included details in his arrest report related to probable cause that were "boilerplate" and had nothing to do with Anderson. Specifically, he wrote, "It is my belief that *Anderson* continues to possess firearms for felonious activities." Defense Ex. FF (emphasis added). When asked if he actually believed this, he said "yes" but eventually admitted that it was "boilerplate" and that it had "nothing to do specifically with [Anderson] . . . ." This admission is extremely troubling and makes the Court question the reliability of statements in the arrest report, including general statements like Anderson appearing to be nervous.

Next and relatedly, there are several other problems with accuracy of the arrest report. For example, Detective Riley wrote, "I observed Anderson exiting the vehicle, at which time marked Patrol Officers . . . conducted a person stop on" Anderson. Defense Ex. FF. However, Detective Riley testified that he did not lay eyes on Anderson at this time. Instead, he parked 30 yards north

---

[29] Of note, Detective Williams never testified to seeing Detective Riley in this area. And, the fact that Detective Williams radioed for someone else to maintain surveillance on Anderson after Detective Williams passed Anderson at stop 3 suggests that Detective Riley was not in the area yet.

and "out of view." Additionally, Detective Riley's arrest report also incorrectly states that immediately after Detective Mermini was backed into, Detective Williams arrived and maintained constant surveillance on Anderson's vehicle, including watching him get back into his car (after looking for damage) and driving to stop two.[30] Defense Ex. FF. Detective Williams' testimony, which the Court found credible, makes clear that this portion of the report is not accurate; Detective Williams did not see Anderson until he pulled up next to Detective Williams at stop two. Finally, Detective Riley's account of Anderson looking nervous is conclusory and does not provide any details regarding what Anderson was doing that made Detective Riley conclude he was nervous. The arrest report simply states, "Anderson appeared to be nervously looking around the area and parking lot." Defense Ex. FF. Accordingly, the Court is unsure whether Detective Riley saw Anderson looking nervous, as the arrest report states.

Second, the Court is unsure whether Detective Riley saw Anderson with his "head on a swivel," as he testified to. Detective Riley testified that just before he parked at stop three, he observed Anderson. Anderson "appeared to be very frantic; appeared to be head on a swivel." "The driver's door was left open; the trunk was popped, as was the hood." As already explained, however, Detective Riley gave inconsistent accounts of when he first saw Anderson, whether the trunk or hood was already open, or if he saw Anderson open them. Accordingly, the Court is unsure if Detective Riley's narrative about seeing Anderson with the driver's door, trunk, and hood open with his "head on a swivel" is accurate.

Additionally, it seems implausible that Anderson would openly display a firearm for several seconds, drive around the corner, and then, all the sudden, stop, leave the trunk, hood, and driver door open, and frantically look around. Detective Riley explained that he thought Anderson

---

[30] This portion of the arrest report provides the following:

> Det. Williams P#14530 arrived and maintained constant surveillance on the vehicle. Anderson was observed exiting his vehicle and assessing damage caused to his rear bumper and the front of Det. Mermini's vehicle . . . Det. Williams observed Anderson re-occupying the Lexus and driving through the parking lot eastbound. The Lexus parked on the south side of building "G" and Anderson was observed exiting the vehicle. Det. Williams observed Anderson walking up a set of stairs and knocking on a door.

Defense Ex. FF.

had caught on to the fact that Detective Williams was following him, but his explanation made little sense. Defense counsel asked, "so you thought that [Anderson] had realized Detective Williams was following him so he decided to pull over?" Detective Riley immediately answered, "no." Defense counsel continued, "and open the hood and the trunk and quickly and?" Detective Riley interjected "conceal an item? Yes." Defense counsel continued, "Because that would be the way to avoid arousing the suspicion of the officer?" Detective Riley answered, "Absolutely." Detective Riley's explanation for Anderson's behavior strains credulity and only adds to the Court's doubts about his testimony. For all these reasons, the Court is unsure whether Detective Riley saw Anderson with his "head on a swivel."

The Court also made note of the exchange between defense counsel and Detective Riley regarding the area's crime rate and how that may or may not have related to forming reasonable suspicion in this case. Not only were Detective Riley's answers on direct and cross-examination diametrically opposed, his Hail Mary attempt to escape further questioning was to take cover by resorting to his "training and experience." The Court found this tactic evasive and non-responsive.

After Detective Riley allegedly saw Anderson and Anderson was subsequently stopped, Sergeant Seely directed Detective Riley to help with the execution of the search warrant. Detective Riley did so. After the search warrant was executed, Detective Riley went to where Anderson was stopped to search his car.

Detectives Williams and Riley searched Anderson's vehicle. Based on Detective Williams, Detective Riley, and Mr. Lucious' testimony, it is unclear if Anderson's car was searched more than once.[31] At some point, however, Detectives discovered a firearm in the hood of Anderson's car.

## IV.    The Parties' Arguments[32]

### A.    Anderson's Opening Brief

Anderson argues that the search of his car violated his Fourth Amendment rights.

---

[31] The Court does not need to make a finding regarding this fact to decide the motion. However, it is yet another example of the many inconsistencies in the record.
[32] The parties' briefs were filed before the evidentiary hearing.

First, Anderson argues that police lacked reasonable suspicion to stop him for allegedly violating any traffic law after he hit Detective Mermini's car. ECF No. 32 at 8-9. Anderson argues that he exited his vehicle, saw no evidence of damage to either vehicle and did not see anyone in Detective Mermini's car. *Id.* at 9. As such, he did not violate Nevada law related to leaving the scene of an accident. *Id.* at 8-9.

Next, Anderson argues that officers unreasonably prolonged his stop. *Id.* at 9-11. Anderson argues that even if police did have reasonable suspicion to stop him after seeing him with a gun, they impermissibly prolonged the stop. *Id.* at 10-11. Anderson contends that after stopping him, they waited around 30-minutes to conduct a background check and did not otherwise investigate whether his possession of the gun was lawful. *Id.*

Anderson also argues that after police discovered he was a convicted felon, they impermissibly prolonged the search of his car, continuing to wait to search it. *Id.* at 11-12.

Ultimately, Anderson contends that police violated his Fourth Amendment rights in conducting the warrantless search of his car. *See id.* at 12. As such, Anderson moves to suppress the gun and related evidence that was discovered. *Id.*

### B.    The Government's Response

The government responds by arguing that the search of Anderson's car was lawful. ECF No. 40.

The government begins by arguing that by the time officers stopped Anderson, police had probable cause to arrest him for leaving the scene of an accident, in violation of NRS 484E.020. *Id.* at 4-6.

The government also argues that when Anderson was initially stopped, the police had reasonable suspicion to detain him for illegally carrying a concealed weapon. *Id.* at 7. According to the government, reasonable suspicion existed based on the following: (1) Detective Williams saw Anderson carrying a concealed weapon in his waistband; (2) Detectives also witnessed Anderson "nervously looking around the parking lot" before tampering under the hood of his car; and (3) Anderson had "just fled the scene of an accident." *Id.*

1    The government argues that officers' reasonable suspicion (that Anderson was illegally

2    carrying a concealed weapon) ripened into probable cause (to believe both that he was illegally

3    carrying a concealed weapon and that he was a felon in possession of a firearm) when they ran his

4    criminal background check and discovered he had several felony convictions. *Id.* at 8.

5    The government argues that once officers discovered Anderson was a prohibited person,

6    they were entitled to search his car without a warrant under two exceptions to the warrant

7    requirement. First, the government argues police could search Anderson's vehicle under the

8    automobile exception to the Fourth Amendment. *Id.* at 8-10. Second, the government argues that

9    police could search Anderson's car incident to arrest. *Id.* at 10-11.

10   Finally, the government argues that any extension of Anderson's stop is irrelevant. *Id.* at

11   11-12. This is so, according to the government, because when Anderson was stopped, police

12   already had probable cause to arrest him for the violating NRS 484E.020 (after hitting Detective

13   Mermini's car). *See id.*

14   **C.    Anderson's Reply**

15   In reply, Anderson reiterates arguments from his motion and points out several alleged

16   discrepancies between the arrest report (upon which the government relies) and the other

17   evidence produced in this case. ECF No. 43.

18   **V.    Analysis**

19   The Fourth Amendment of the United States Constitution protects "[t]he right of the

20   people to be secure in their persons, houses, papers, and effects[] against unreasonable searches

21   and seizures." U.S. Const. Amend. IV.[33] "The Fourth Amendment proscribes all unreasonable

22   searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial

23   process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth

24   Amendment—subject only to a few specifically established and well-delineated exceptions.'"

25   *Mincey v. Arizona*, 437 U.S. 385, 390 (1978); *see also United States v. Scott*, 705 F.3d 410, 416

26   (9th Cir. 2012) (warrantless searches are per se unreasonable, subject to a few exceptions).

27

28   [33] The Fourth Amendment is applicable to the states by the Fourteenth Amendment. *Terry v. Ohio*, 392 U.S. 1, 8 (1968).

"The burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government." *Scott*, 705 F.3d at 416; *see also United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991). ("The government bears the burden of justifying a warrantless search."). The government must meet this burden with "proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *see also Lego v. Twomey*, 404 U.S. 477, 488-489 (1972) (articulating same standard of proof).

### A.    Whether Police Had Probable Cause to Arrest Anderson for the Accident

"A police officer has probable cause to arrest a suspect without a warrant if the available facts suggest a 'fair probability' that the suspect has committed a crime." *United States v. Hartz*, 458 F.3d 1011, 1018 (9th Cir. 2006). A "fair probability" has been interpreted to mean a "substantial chance." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371 (2009) ("probable cause" requires a "fair probability" or a "substantial chance"). Whether probable cause exists depends on the totality of the circumstances. *Rodis v. City & Cnty of San Francisco*, 558 F.3d 964, 969 (9th Cir. 2009).

Here, the government argues that it had probable cause to arrest Anderson for violating NRS 484E.020 when he left after hitting Detective Mermini's car. ECF No. 40 at 5. NRS 484E.020 provides:

> The driver of any vehicle involved in a crash resulting only in damage to a vehicle or other property which is driven or attended by any person shall:
>
> 1. Immediately stop his or her vehicle at the scene of the crash; and
>
> 2. If the driver's vehicle is creating a hazard or obstructing traffic and can be moved safely, move the vehicle or cause the vehicle to be moved out of the traffic lanes of the roadway to a safe location that does not create a hazard or obstruct traffic and, if applicable, safely fulfill the requirements of NRS 484E.030.

Nev. Rev. Stat. Ann. § 484E.020 (West).

In this case, the Court does not find that officers had probable cause to arrest Anderson for violating NRS 484E.020 when he was stopped, as the government argues. *See* ECF No. 40 at 5. When Anderson was initially stopped, the facts did not suggest a fair probability or substantial chance that when Anderson bumped into Detective Mermini, it caused "damage to a vehicle or

other property," which is required for the statute to apply. *See* Nev. Rev. Stat. Ann. § 484E.020 ("The driver of any vehicle involved in a crash resulting only in damage to a vehicle or other property" must do certain things.).

When Anderson backed into Detective Mermini, neither Detective Mermini nor any other officer inspected Detective Mermini or Anderson's car for damage.[34] As such, the only information that Detective Mermini had to determine whether there was a fair probability of damage was the impact he felt when he was hit. If the Court believed Detective Mermini that Anderson hit him rather hard (slamming him into his seat), then Court would find that a fair probability existed that there was property damage (and that the statute applied). In this case, however, the Court does not believe that Anderson hit Detective Mermini hard at all. There is no credible evidence to suggest this. Instead, the Court already found that there is an absence of reliable evidence that either vehicle was damaged as a result of the accident. The Court also found that there was an absence of reliable evidence that Detective Mermini immediately reported pain or was injured. Accordingly, and critically, the evidence suggests that Anderson most likely only slightly bumped Detective Mermini's car. Feeling only a slight bump, a "a man of reasonable caution" would not have believed that there was a fair probability or substantial chance that either vehicle was damaged. *See Safford*, 557 U.S. at 370 (probable cause exists when the facts within an officer's knowledge are sufficient to warrant "a man of reasonable caution" believing that an offense was committed). As such, the government has not proven by a preponderance of the evidence that when Anderson was initially stopped, there was a fair probability or substantial chance that either vehicle was damaged in the accident. Accordingly, officers did not have probable cause to arrest Anderson for violating NRS 484E.020.[35]

---

[34] The government notes that on body camera footage, "Officer Avalos can be seen circling Anderson's car immediately after he is detained 'to see where the damage would be.'" ECF No. 40 at 6. However, the Court finds that Officer Avalos' walk around Anderson's car does not support the government's argument that police had probable cause to arrest Anderson for the accident. First, Anderson was already in handcuffs by the time that Officer Avalos walked around Anderson's car. *See* Government's Ex. H (body camera footage). Second, Officer Avalos can be heard saying, "I'm trying to see where the damage would be." *Id.* However, she does not appear to locate any damage in the video, and she did not testify that she observed any damage at this point in Anderson's stop.

[35] Because the Court does not find that police had probable cause to arrest Anderson for violating NRS 484E.020, the Court need not reach whether Anderson failed to comply with NRS 484E.030, as the government argues. However, were the Court to consider whether police had probable cause to believe that Anderson violated NRS 484E.030, the

**B.    Whether Police Had Reasonable Suspicion to Believe Anderson Was Illegally Carrying a Concealed Weapon**

"Reasonable suspicion exists if 'specific, articulable facts . . . together with objective and reasonable inferences' suggest that the persons detained by the police are engaged in criminal activity." *Hartz*, 458 F.3d at 1017. Determinations about "reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

The Court does not find that the government proved by a preponderance of the evidence that police had reasonable suspicion to believe Anderson was illegally carrying a concealed weapon. The government argued that police had reasonable suspicion to believe Anderson was illegally carrying a concealed weapon based on the following: (1) Detective Williams saw Defendant carrying a concealed weapon in his waistband; (2) Detectives witnessed Defendant "nervously looking around the parking lot" before tampering under the hood of his car; and (3) Anderson had "just fled the scene of an accident." ECF No. 40 at 7. The Court evaluates these facts below.

First, as the Court previously explained, it finds that Detective Williams saw Anderson carrying a concealed weapon in his waistband. Second, as the Court also explained in detail above, the Court does not know whether Detective Riley saw Anderson looking nervously around the parking lot and tampering under his hood or not. The Court finds it at least equally likely that Detective Riley did *not* see this as it finds it that Detective Riley did see this. Put simply, the government did not prove by a preponderance of the evidence that Detective Riley saw Anderson looking nervous and tampering under this hood. Third, the Court finds that Anderson leaving the

---

Court would similarly find that officers did not have probable cause to believe that there was an accident involving vehicle damage or injury (for all the reasons already discussed).

Additionally, though the parties did not address this issue, the Court questions whether officers could legally arrest Anderson even if there was probable cause to believe the accident resulted in property damage. NRS 484A.710 specifies when arrests can be made for certain traffic violations. Arrests for violations of NRS 484E.020 (which the government relies on) can only be made when the accident occurs "upon or adjacent to a highway . . . ." *See* NRS 484A.710(1)(f). The accident in this case occurred in an apartment complex parking lot. Additionally, arrests for violations of NRS 484E.030 (which the government also relies on) may only be made when the accident results in death or personal injury. *See* NRS 484A.710(1)(e). Here, again, the Court found that the government did not carry its burden to show that Detective Mermini was injured (and in all events, he only reported allegedly being injured about 45-minutes after Anderson was taken into custody).

accident does not support a reasonable inference that Anderson was illegally concealing a firearm. As an initial matter, Anderson did not "flee" the scene of the accident; he stopped, got out of his vehicle, and checked for damage. Anderson then drove to a parking spot nearby, had a brief conversation with a woman, and displayed his firearm for several seconds. Nothing about this sequence of events suggests that Anderson fled the scene of the accident to avoid someone discovering he unlawfully possessed a firearm. In other words, it is not reasonable to infer that Anderson left the scene of an accident because he was unlawfully carrying a concealed weapon. The only articulable fact, then, that officers knew to support their suspicion that Anderson was unlawfully concealing a firearm was the fact that Detective Williams saw him with a concealed firearm.

Officers did not have reasonable suspicion to believe that Anderson was unlawfully carrying a concealed weapon. In Nevada, it is not unlawful to carry a concealed weapon if you have a permit. *See* Nev. Rev. Stat. Ann. §§ NRS 202.3653-202.369. As explained above, at the time that officers stopped Anderson, the only fact officers knew to support their reasonable suspicion was the fact that Detective Williams saw him with a concealed firearm. This is insufficient, as officers had no reason to believe he did not have a permit to lawfully carry his concealed firearm. *See United States v. Brown*, 925 F.3d 1150, 1154 (9th Cir. 2019) (evidence that a suspect is carrying a concealed weapon in a state that issues concealed carry permits does not alone support a *Terry* stop).[36] Accordingly, officers did not have reasonable suspicion to stop Anderson for illegally carrying a concealed weapon.

### C.    Whether the Government Lawfully Searched Anderson's Car

As discussed above, Anderson's stop was not supported by probable cause to believe he violated NRS 484E.020 or reasonable suspicion to believe he was illegally carrying a concealed weapon. The stop therefore violated the Fourth Amendment. *See United States v. Twilley*, 222 F.3d 1092, 1096 (9th Cir. 2000) (stop not supported by reasonable suspicion violated the Fourth

---

[36] In the Ninth Circuit, "the reasonable suspicion analysis is different" depending on whether carrying a concealed weapon is presumptively unlawful or not under applicable state law. *See United States v. Bontemps*, 977 F.3d 909, 914 (9th Cir. 2020).

Amendment). The search of Anderson's vehicle was a direct result of the unlawful stop. *See id.* at 1097. Accordingly, the evidence obtained from Anderson's car should be suppressed. *See id.* ("[T]he stop was not supported by reasonable suspicion, and because the subsequent search was a product of the stop, the evidence leading to [the defendant's] conviction should have been suppressed.").

**VI.    Conclusion**

　　　**IT IS THEREFORE RECOMMENDED** that Defendant's motion to suppress (ECF No. 32) be GRANTED.

NOTICE

　　　This report and recommendation is submitted to the United States district judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).


　　　DATED: September 21, 2021

　　　　　　　　　　　　　　　　　　　　BRENDA WEKSLER
　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE



